**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Ocala division**

| | |
|---|---|
| SKY ROBERTS,<br><br>Plaintiff,<br><br>v.<br><br>PENGUIN RANDOM HOUSE, LLC d/b/a ALFRED A. KNOPF, a Delaware limited liability company; and, AMY WALLACE, an individual,<br><br>Defendants. | Case no:<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Sky Roberts ("Sky Roberts"), sues Defendants, Penguin Random House, LLC ("Random House"), a Delaware limited liability company, and Amy Wallace, a citizen of California ("A. Wallace"), and alleges as follows:

## NATURE OF ACTION

1.      This is an action for damages for defamation arising from Defendants' publication of *Nobody's Girl: A Memoir of Surviving Abuse and Fighting for Justice by Virginia Roberts Giuffre* (the "Memoir"), published by Alfred A. Knopf, an imprint of Defendant Random House, with a "collaborator's" note by Defendant A. Wallace.

2.      A. Wallace's self-anointed title of "collaborator" is a marketing grift.  Random House and A. Wallace's involvement in the formulation,

authoring, drafting, and editing processes were substantial and dominating. She, for all intended purposes, is the "ghost writer" of the Memoir and, as such, is imparted with all legal duties and liabilities attendant to any author and publisher of the book.

3.     The Memoir falsely states and republishes that Plaintiff Sky Roberts, Virginia Roberts Giuffre's father, sexually abused, molested, and raped his daughter when she was a child, and that he knowingly gave her to another man to molest.  These statements accuse Plaintiff of criminal sexual abuse of a child, incest, molestation, and rape. The statements are defamatory on their face and constitute defamation per se under Florida law.

4.     Before publication, Defendants had actual notice that Plaintiff denied the allegations. The Memoir itself states that Wallace reached out to Plaintiff multiple times and that Plaintiff "strenuously" denied the allegations. The Memoir also prints Plaintiff's denial that he ever abused or sexually touched his daughter.  Despite Plaintiff's denial, Defendants published, distributed, marketed, and sold the Memoir throughout Florida and the United States, including in this District.

5.     Plaintiff seeks compensatory damages, presumed damages to the extent permitted by law, special damages, punitive damages, pre- and post-judgment interest, costs, and all other relief the Court deems just and proper.

## PARTIES

6.      Plaintiff, Sky Roberts, is an individual and the father of Virginia Roberts Giuffre, deceased. Plaintiff resided- and still resides- in Ocala, Florida when the Memoir was published.

7.      Defendant, Random House, is a limited liability company that publishes books, including through the Alfred A. Knopf imprint.  Random House is organized under the laws of Delaware, has its principal place of business in New York, and its members are citizens of states other than Plaintiff's state of citizenship. Plaintiff will amend this allegation if discovery shows additional or different citizenship facts.

8.      Defendant A. Wallace is an author, journalist, and collaborator who "ghost wrote" the Memoir under the auspices of a collaborator.  She substantially and primarily conducted the writing, editing, and publishing of the challenged defamatory statements.  According to her own admissions, A. Wallace was the primary, if not sole author of the Memoir as its "ghost writer."  See Towie, N., "Virginia Giuffre's 'invisible ghostwriter' on the Epstein Survivor's legacy: 'She wanted to name all of them.  They deserved to be named," The Guardian, March 6, 2026.[1]

---

[1]  https://www.theguardian.com/us-news/2026/mar/06/virginia-giuffre-memoir-epstein-files-names-ghost-writer-amy-wallace-ntwnfb

9. As further alleged *infra*, A. Wallace lacked all relevant education, expertise, or training in science, neuroscience, and psychology to appreciate, let alone work with, a person suffering from Virgina's physical, mental, and emotional impairments in assessing memory recall and safeguarding same from distortion and false accusations. Recently, A. Wallace, by her own admissions, purportedly enlisted the help of her therapist during her own therapy sessions on how to deal with Virgina. Id. ("I have a therapist and a lot of my therapy sessions were talking about either Virginia or how I could be sensitive to Virginia in terms of how to be careful, how to not re-injure her, Wallace says.").

10. At all relevant times, Defendant Random House deemed A. Wallace as its agent, employee, and/or representative with full authority to write, edit, publish, approve and to take any and all actions and omissions related to ghost writing, drafting, authoring, and marketing of the Memoir.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

12. The amount in controversy exceeds $75,000 because the challenged publication accuses Plaintiff of child sexual abuse, incest, molestation, and rape; was published nationally and internationally; was

sold and distributed in Florida; and caused severe reputational, emotional, and economic harm to Plaintiff in Ocala, Florida (his place of residency).

13. This Court has personal jurisdiction over Defendants because Defendants purposefully published, distributed, promoted, and sold the Memoir in Florida; directed the Memoir into the Florida market; derived revenue from sales in Florida; and caused injury to Plaintiff in Florida. See Fla. Stat. §§ 48.193(1)(a)(1), (2); and § 48.193(2).

14. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, the Memoir was published, sold, distributed, and accessed in this District, and Plaintiff suffered reputational and other injury in this District.

## FACTUAL ALLEGATIONS

**A.  The Memoir, Defendants' Publication, and the Defamatory Allegations of Criminal Molestation by Plaintiff of His Very Own Daughter.**

15. In about 2025, Defendant Random House, through its Alfred A. Knopf imprint, published the Memoir. A true and correct copy of the relevant pages of the Memoir containing the defamatory allegations that are the subject of this lawsuit is attached as Exhibit A. In Chapter Three, the Memoir identifies Virginia's father as Sky Roberts and states that he and Virginia's mother married in December 1982 and had Virginia eight months later.

16.     In the Memoir, Defendants published purported factual statements that Plaintiff Sky Roberts sexually abused, molested, and raped his daughter when she was a child, and that he knowingly gave her to another man to molest.  These statements accuse Plaintiff of criminal sexual abuse of a child, incest, molestation, and rape.  Specifically, these statements include:

### (TABLE 1)

| # | Memoir Cite | Statement / Allegation |
|---|---|---|
| 1 | p. 9 | Defendants state that, in corroborating Virginia's childhood abuse, she spoke with people "***to whom Virginia had recounted the abuse by both her father and his friend***," and that Virginia's father denied the allegations. |
| 2 | p. 12 | The note reproduces the father's denial: "**I never abused my daughter" and "never ever touched her sexually**." |
| 3 | p. 41 | Virginia alleges that during bath time, her father washed her naked body and spent "***extra time between my legs***." |
| 4 | p. 41 | Virginia alleges: "***Dad touched me in ways nobody had before***," called her his "***special girl***," **used his fingers, then his mouth, and asked her to touch his genitals**. |
| 5 | p. 41 | Virginia states that the "***bedtime rituals ended, but the abuse didn't***," and describes her father entering her room, getting into her bed, "fondling me" and "forcing himself on me." |
| 6 | p. 42 | Virginia describes a memory of her father **molesting her while her bedroom door opened**. |
| 7 | p. 42 | Virginia states that a doctor told her mother her hymen had been broken, in the context of the alleged abuse. |
| 8 | p. 42 | Virginia alleges that after Danny was sent away, her father "***changed up his tactics***," molested her in the afternoon, and normalized the abuse with movies and popcorn. |

| # | Memoir Cite | Statement / Allegation |
|---|---|---|
| 9 | p. 43 | Virginia alleges that her father or Forrest suggested "*trading*" Virginia and Sheila for a night, and that she was first left with Forrest "with my father's permission." |
| 10 | p. 43 | Virginia alleges Forrest did things to her that "*my father had done*," including putting fingers inside her "*like my dad did*." |
| 11 | p. 44 | Virginia states she had "never said publicly that my father molested me and then gave me to another man to molest." |
| 12 | p. 44 | Virginia alleges Forrest first penetrated her with his penis and that "*not long afterward, my father did the same*." |
| 13 | p. 44 | Virginia alleges that what Forrest and her father did was so similar she suspected they were "*comparing notes*," and that they "*liked to spend time with me together*." |

**B.**  **Statements of Criminal Sexual Abuse by a Father of His Minor Daughter Are "Per Se" Defamatory Due to the Horrendous Nature of the Underlying Crimes.**

17.     Florida criminal statutes criminalize sexual offenses such as rape and child molestation, including acts committed by a father against his minor daughter. Relevant Florida statutes typically include definitions and penalties for sexual battery, lewd or lascivious molestation, and incest, which broadly cover sexual acts against minors by persons in custodial authority, including parents. These offenses carry enhanced penalties when the victim is a child under a specified age, such as under 12 or 16, and when the offender occupies a position of authority or familial relationship.

18.     The following table identifies and summarizes Florida's criminal statutes implicated by Defendants' statements of rape, incest, and molestation against his minor daughter Virginia:

**(TABLE 2)**

| Florida State Criminal Statutes on Sexual Molestation | | | |
|---|---|---|---|
| **Statute** | **Offense** | **Victim Age** | **Felony Level** |
| § 794.011(2)(a) | Sexual battery (general or familial authority) | Under 12 | **Capital Felony** (death/life) |
| § 794.011(8)(c) | Sexual battery by familial authority | Under 12 | **Capital or Life Felony** |
| § 794.011(3) | Sexual battery with deadly weapon/serious force | 12+ | **Life Felony** |
| § 800.04(5)(b) | Lewd/lascivious molestation | Under 12 | **Life Felony** |
| § 794.011(8)(b) | Sexual battery by familial authority | 12–17 | **1st Degree Felony** (up to life) |
| § 794.011(4)(a) | Sexual battery, aggravated circumstances | 12–17 | **1st Degree Felony** (up to life) |
| § 800.04(4) | Lewd/lascivious battery | 12–15 | **2nd Degree Felony** |
| § 800.04(5)(c) | Lewd/lascivious molestation | 12–15 | **2nd Degree Felony** |
| § 800.04(6) | Lewd/lascivious conduct | Under 16 | **2nd Degree Felony** |
| § 800.04(7) | Lewd/lascivious exhibition | Under 16 | **2nd Degree Felony** |
| § 794.05 | Unlawful sexual activity | 16–17 | **2nd Degree Felony** |
| § 826.04 | Incest | Any minor | **3rd Degree Felony** |

| § 794.011(8)(a) | Solicitation by familial authority | Under 18 | **3rd Degree Felony** |
|---|---|---|---|

## C.    Defendants' Exploitation of Virginia's Physical, Mental, and Emotional Impairments During the Memoir's Pre-Publication Period.

### 1.    Defendants' Fact Checking Techniques and Virginia's Physical, Mental and Emotional Impairments.

19.    At all times material hereto, Defendant Random House acted by and through A. Wallace, its employee, representative, and/or agent charged with full and actual authority to ghostwrite the Memori, including all pre-publication actions and decisions.

20.    Defendant A. Wallace possesses no education, expertise or specialized training, whether medical, scientific or otherwise to render her competent in interviewing sexual abuse survivors (or other crime victims). This is particularly true for victims where the purported abuse occurred decades previously or in childhood.

21.    Defendant A. Wallace employed a purported, certain coercive bolstering "collaboration" technique on Virginia, self-described as follows:

- "During every project I've worked on, at some point I must ask the author some extremely personal questions. **Next, I bolster their memories**, no matter how vivid, by working to corroborate them— reviewing all preexisting documentation and talking to others in their lives who may have witnessed or known about the events being described."

- Wallace stated that she and Virginia had "hundreds of conversations and text and email exchanges" over four years. Wallace wrote that, at Virginia's direction, she helped tell Virginia's "whole story" and, "just as

importantly," helped "**to interrogate it, to confirm it**."

- Regarding the childhood sexual-abuse allegations, Wallace wrote: "When it came to corroborating the abuse Virginia had suffered as a child, **I tracked down a childhood friend who was incredibly forthcoming about the abuse this friend endured by her stepfather**, the same man who sexually abused Virginia as a child and who later was convicted for abusing yet another minor."

- Wallace further wrote: "In consultation with a professional factchecker, I also spoke at length to Virginia's mother, her husband, her former boyfriend, and her two brothers to whom **Virginia had recounted the abuse by both her father and his friend**."

See Memoir,§ "A Note from Virgina Roberts Giuffre's Collaborator."

22.    At a time unknown to Plaintiff, Defendant Random House in collaboration with and through Defendant A. Wallace commenced the co-authorship, ghost writing process, with Virginia for the authoring, drafting, revising/editing, and eventual publication of the Memoir (the "Pre-Publication Period").

23.    Upon information and belief, and as is customary, Defendants Random House and A. Wallace entered into publication contracts between themselves and/or Virginia that set forth intellectual property rights, royalty rights, as well as the obligations and rights of the respective parties thereto to draft, edit, review, change and/or publish the Memoir.

24.    At all times material hereto and, in particular, during her Pre-Publication Period with Defendants, Virginia's physical, mental and

emotional well-being had significantly deteriorated- and continued to deteriorate- to the point where she was a danger to herself and others. Moreover, at a point in time unknown to Plaintiff, Virgina's physical and mental well-being rendered her with the lack of legal capacity to contract, provide statements under contracts, and otherwise look after herself.[2]

25.     On April 25, 2026, Virginia died by purported suicide due to her deteriorated physical, mental, and emotional well-being.

### 2.     The Medical Science Behind Memory Recollection.

26.     Scientific, medical, psychological, and neuropsychological studies confirm that a person's "memory" does not function like a video recorder.  Instead, memories are reconstructed at the time of a person's

---

[2] As to her marriage, in August, 2023 Virginia announced her marital separation to her husband Robert Giuffre.   They separated after 22 years of marriage amid escalating conflict.  During this time, Virginia was repeatedly physically abused by her husband. On January 9, 2025, Virgina recounted reported domestic violence incident whereby she was brutally assaulted by Robert during a family trip, suffering a cracked sternum and a perforated eye (requiring hospitalization).  In February, 2025, her husband obtained a Family Violence Restraining Order (FVRO) against Virginia.   Under the FVRO, her husband was granted temporary custody of their three children and prohibited Virginia from contacting or approaching him or their kids until June 2, 2025. The alienation consequence of FVRO physically, mentally, and emotionally further devastated Virginia. Giuffre allegedly breached the order on Feb 2 by phoning Robert, leading to a charge of violating the FVRO and a court hearing set for Mar 14, 2025.

On March 30, 2025, Distressing Instagram Post: From her hospital bed, Giuffre shares a graphic photo of her bruised face on Instagram, claiming "I've gone into kidney renal failure, they've given me four days to live... I'm ready to go, just not until I see my babies one last time. She was hospitalized in late March 2025 for a serious condition precipitated by a car accident, and that she recovered enough to be discharged after about a week of treatment.  For example, her drastic claim of imminent death (the "four days to live" post). Health Crisis After the Crash: In the days following the accident, Giuffre's condition suddenly deteriorates. She is hospitalized in serious condition at Sir Charles Gairdner Hospital in Perth with what she describes as "kidney (renal) failure."

recall. Memories are instead rebuilt from fragments that are influenced by later memories. Consequently, the "recall process" makes memory flexible, adaptive and, most importantly here, ***vulnerable to distortion***. Specifically, each act of recall may be affected by later information, emotional state, expectations, repetition, questioning, and the perceived authority or trustworthiness of the person eliciting the recollection.

27. Memory recall distortion occurs in instances where the person has suffered or is suffering from several different impairment factors including, but not limited to, past, current or anticipate future trauma; PTSD; depression; grief; dependency; fatigue; and psychological distress. These distortion factors impair the function of "source monitoring," meaning the ability to distinguish an event actually experienced from information suggested later, imagined, inferred, or absorbed from another source.

28. Individuals under emotional distress are considered more susceptible to suggestion, particularly when the suggested information is emotionally congruent with existing distress, when the source is trusted, when questioning is repeated, or when the subject is encouraged to construct a coherent narrative from fragmented recollections. Specific to false memories of abuse, such false memories can arise or be caused due to well-studied and predicted variable conditions, including:

- repeated questioning;

- suggestive interviewing;

- guided reconstruction;

- strong expectations that abuse occurred;

- pressure from authority figures; and

- repeated rehearsal of an emerging narrative.

29.     At all times material hereto, it is well known in the criminal forensic, medical, psychology, and neuropsychology fields that sexual-abuse memory claims present special forensic concerns because true abuse may occur in private and lack physical evidence, while false or distorted memories may also develop or become reinforced through suggestion, repetition, and narrative reconstruction.

30.     At all times material hereto, Defendants Random House and A. Wallace owed all persons in the foreseeable zone of risk, i.e., persons for whom they would publish statements of fact that such persons committed criminal sexual abuse, molestation, and rape, a duty of care to ensure that they did not elicit and, thus, rely on false, distorted memories of sexual abuse.  Such duties extended to Plaintiff Sky Roberts relative to Defendants' publication of the Memoir.  This is particularly true given Sky Roberts is not a "public person" and, instead, is a "private person" within the recognized meanings under defamation law.

### 3.    A. Wallace's Exploitation of Virgina's Physical, Mental and Emotional Impairments.

31.    Defendant A. Wallace engaged in repeated, emotionally charged questioning and narrative-development sessions with Virginia over a period of years, including hundreds of conversations and text and email exchanges.

32.    Wallace did not merely transcribe preexisting fixed memories; she actively participated in shaping, organizing, interrogating, confirming, editing, and reinforcing Virginia's account for publication as a Memoir. Wallace's role as a collaborator, journalist, investigator, and trusted narrative partner placed her in a position of influence over Virginia's recollection and interpretation of past events.

33.    Wallace repeatedly revisited alleged childhood abuse with Virginia, encouraged Virginia to supply detail, helped connect alleged events into a coherent abuse narrative, and treated the father-abuse allegations as capable of corroboration and confirmation. Wallace's repeated questioning, reinforcement, narrative framing, and stated effort to "confirm" Virginia's account materially contributed to the creation, reinforcement, or hardening of false memories concerning Plaintiff.

34.    To the extent Virginia came to believe or express that Plaintiff sexually abused, molested, raped, or gave her to another man to molest, that belief was materially influenced, reinforced, and made more certain by Wallace's coercive process.

35. Defendants failed to account adequately for the risk that repeated questioning and narrative reconstruction could create or reinforce false memories, particularly where the allegations involved childhood events allegedly recalled and newly publicized decades later.

36. A. Wallace's coercive techniques involved the use of repeated questioning, suggestive interviewing, guided reconstruction, strong expectations that abuse occurred, pressure to publish, and repeated rehearsal of an emerging narrative that distorted the Virgina's memory recall thereby causing her to falsely stated that her father abused her.

37. Defendants failed to obtain sufficient independent corroboration for the allegations that Plaintiff sexually abused Virginia, as distinct from allegations concerning Forrest or other alleged abusers.

38. Plaintiff does not allege that all trauma memories are false, that all delayed or recovered memories are unreliable, or that all sexual-abuse allegations require physical evidence. Plaintiff alleges that, under the circumstances here, Defendants failed to account for well-recognized risks of memory distortion, suggestion, and false-memory reinforcement before publishing specific criminal accusations against Plaintiff.

39. The challenged statements are false.

40. Plaintiff did not sexually abuse Virginia Roberts Giuffre.

41. Plaintiff did not molest Virginia Roberts Giuffre.

42. Plaintiff did not rape, penetrate, or otherwise sexually touch Virginia Roberts Giuffre.

43. Plaintiff did not give Virginia Roberts Giuffre to another man to molest.

44. Plaintiff did not knowingly permit, authorize, assist, facilitate, or participate in any sexual abuse of Virginia Roberts Giuffre by Forrest or any other person.

45. Plaintiff expressly denied the allegations before publication, and Defendants published his denial in the Memoir.

**D. Falsity, Defamatory Meaning, and Fault.**

46. The challenged statements are factual assertions capable of being proven true or false.

47. The challenged statements are not rhetorical hyperbole, parody, or nonactionable opinion. They purport to describe specific historical events involving alleged sexual acts against a child.

48. The challenged statements are defamatory per se because they accuse Plaintiff of serious criminal conduct, including child sexual abuse, incest, molestation, and rape.

49. Statements accusing a person of rape, sexual molestation, or similarly infamous crimes are defamatory on their face and actionable as defamation per se.

50.    Plaintiff is a private person. To the extent Defendants contend Plaintiff is a limited-purpose public figure, Plaintiff pleads in the alternative that Defendants published the challenged statements with actual malice: knowledge of falsity or reckless disregard for whether the statements were false.

51.    Defendants acted at least negligently by publishing the challenged statements without reasonable care as to their truth or falsity. Defendants had reason to doubt the truth of the challenged statements before publication, including because Plaintiff directly, unequivocally, and repeatedly denied the allegations.

52.    Defendants knew the allegations were extraordinarily serious and inherently damaging because they accused Plaintiff of criminal sexual abuse of his minor daughter. Defendants knew that publication of the allegations would foreseeably expose Plaintiff to hatred, contempt, ridicule, disgrace, and social ostracism. Defendants nevertheless published the challenged statements as fact.

53.    Defendants' own statements regarding diligence, corroboration, fact-checking, and accuracy demonstrate that Defendants understood the importance of verification and the foreseeable risk of harm from false statements.

54.    Defendants' publication was not privileged.

55.    Defendants' publication was not a fair report of an official proceeding as to Plaintiff.

56.    Defendants' publication was not substantially true.

57.    Defendants' publication conveyed the false gist that Plaintiff sexually abused, molested, and raped his daughter as a child and facilitated abuse by another man.

58.    Defendants were on actual and/or implied actual notice that the statements were false and inherently unreliable.   There exists no corroborating facts supporting the defamatory statements made in the Memoir about Sky Roberts purported sexual abuse.  Moreover, Defendants never requested, demanded, or even provided Plaintiff with the opportunity prior to publication to provide commercially reasonable, exculpatory information that Defendant A. Wallace either was lying or elicited false memories.   This includes providing the names of family members to interview, as well as polygraph results.  See Exhibit B.

**E.    Publication and Republication.**

1.    Defendants published the challenged statements to third parties by printing, distributing, selling, marketing, and promoting the Memoir.

2.    Defendants caused the Memoir to be distributed to bookstores, libraries, online retailers, reviewers, journalists, and members of the public.

3.    Defendants caused and intended the challenged statements to be read by the public, including readers in Florida and this District.

4.    Each sale, distribution, transmission, and promotion of the Memoir constituted publication or republication of the challenged statements to third parties.

5.    Defendants profited, or expected to profit, from the publication, distribution, marketing, and sale of the Memoir.

**-COUNT I-**
**DEFAMATION / LIBEL PER SE AGAINST RANDOM HOUSE**

6.    Plaintiff realleges and incorporates paragraphs 1 through 63 as if fully set forth herein.

7.    Count I is a claim for defamation per se against Defendant Random House.

8.    Penguin Random House LLC published and distributed the Memoir containing the challenged statements identified above.

9.    The challenged statements are of and concerning Plaintiff.

10.    The challenged statements are false.

11.    The challenged statements are defamatory because they accuse Plaintiff of sexually abusing, molesting, raping, and exploiting his minor daughter, and of facilitating sexual abuse by another man.

12. The challenged statements are defamatory per se because they accuse Plaintiff of infamous crimes and conduct that would subject him to hatred, distrust, ridicule, contempt, disgrace, and social ostracism.

13. Defendant Random House acted at least negligently in publishing the challenged statements.

14. Defendant Random House failed to exercise reasonable care to determine whether the challenged statements were true before publishing them.

15. Defendant Random House had actual notice that Plaintiff denied the allegations before publication. In the alternative, if Plaintiff is deemed a public figure or limited-purpose public figure, Penguin Random House LLC acted with actual malice by publishing the challenged statements with knowledge of falsity or reckless disregard for whether they were false.

16. Defendant Random House's conduct caused Plaintiff reputational injury, emotional distress, humiliation, personal harm, economic harm, and other damages.

17. Plaintiff is entitled to compensatory damages, presumed damages to the extent permitted by law, special damages, punitive damages, costs, interest, and all other relief permitted by law.

18. As a direct and proximate result of Defendant Random House's defamation, Plaintiff has suffered both general and specific damages. These damages include, but are not limited to:

(a) **general damages** for reputational harm, humiliation, and mental anguish, though these must be proven as actual injury rather than presumed;

(b) **nominal damages** established as a matter of law upon a finding of liability;

(c) **special damages** for specific, out-of-pocket economic losses, including, but not limited to:

- Lost employment or business opportunities caused by the publication;

- Lost income or profits attributable to the reputational harm;

- Costs incurred to repair Plaintiff's reputation (e.g., public relations or brand management expenses); and

- Any and all other documented, out-of-pocket financial losses traceable to the defamatory statement.

19. Plaintiff is entitled to claim punitive damages against Defendant Random House.

WHEREFORE, Plaintiff demands judgment against Defendant Random House for damages, both general, specific, and punitive, together with interest and any other relief this Court deems appropriate.

## -COUNT II-
## DEFAMATION / LIBEL PER SE AGAINST A. WALLACE

20. Plaintiff realleges and incorporates paragraphs 1 through 63 as if fully set forth herein.

21. Count II is a claim for defamation per se against Defendant A. Wallace.

22. A. Wallace wrote, collaborated on, investigated, fact-checked, edited, confirmed, approved, and/or caused publication of the Memoir and the challenged statements identified above.

23. Wallace published and caused the challenged statements that Plaintiff committed criminal sexual molestation of his minor daughter Virginia.

24. A. Wallace nevertheless published and caused to be published the challenged statements accusing Plaintiff of sexually abusing, molesting, raping, and exploiting his minor daughter, and of facilitating abuse by another man.

25. The challenged statements are of and concerning Plaintiff.

26. The challenged statements are false.

27. The challenged statements are defamatory per se because they accuse Plaintiff of infamous crimes and conduct that would subject him to hatred, distrust, ridicule, contempt, disgrace, and social ostracism.

28. A. Wallace acted at least negligently in publishing and causing publication of the challenged statements.

29. A. Wallace failed to exercise reasonable care to determine whether the challenged statements were true before publishing or causing publication of them. In the alternative, if Plaintiff is deemed a public figure or limited-purpose public figure, A. Wallace acted with actual malice by

publishing the challenged statements with knowledge of falsity or reckless disregard for whether they were false.

30.    A. Wallace's conduct caused Plaintiff reputational injury, emotional distress, humiliation, personal harm, economic harm, and other damages.

31.    Plaintiff is entitled to compensatory damages, presumed damages to the extent permitted by law, special damages, punitive damages, costs, interest, and all other relief permitted by law.

32.    As a direct and proximate result of Defendant A. Wallace's defamation, Plaintiff has suffered both general and specific damages. These damages include, but are not limited to:

(d)    **general damages** for reputational harm, humiliation, and mental anguish, though these must be proven as actual injury rather than presumed;

(e)    **nominal damages** established as a matter of law upon a finding of liability; and,

(f)    **special damages** for specific, out-of-pocket economic losses, including, but not limited to:

- Lost employment or business opportunities caused by the publication;

- Lost income or profits attributable to the reputational harm;

- Costs incurred to repair Plaintiff's reputation (e.g., public relations or brand management expenses); and,

- Any and all other documented, out-of-pocket financial losses traceable to the defamatory statement.

33.    Plaintiff is entitled to claim punitive damages against Defendant A. Wallace.

WHEREFORE, Plaintiff demands judgment against Defendant A. Wallace for damages, both general, specific, and punitive, together with interest and any other relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable as a matter of right.

Dated:  July 9, 2026.

Respectfully submitted,

**Designated Lead Counsel**

The Alderman Law Firm
*Co-counsel for Plaintiff*
Jason R. Alderman, Esq.
9999 NE 2nd Ave, Suite 211
Miami Shores, FL 33138
Ph. (305) 200-5473
E.:
jalderman@thealdermanlawfirm.com;
    service@thealdermanlawfirm.com

/s/Jason R. Alderman, Esq.
Jason R. Alderman, Esq.
Fla. Bar. No. 0172375

**Co-Counsel**

The Foodman Firm, P.A.
*Co-counsel for Plaintiff*
Daniel Foodman, Esq.
1601 NE 25 Avenue, Suite 205
Ocala, FL 34470

550 Biltmore Way, Suite 1250
Coral Gables, FL 33134
Ph. (305) 201-3663
Email: df@foodmanfirm.com;
service@foodmanfirm.com

/s/ Daniel Foodman, Esq.
Daniel Foodman, Esq.
Fla. Bar. No. 0337160

## **FL R USDCTMD AI Use Certification**

To the extent that generative AI was used in any drafting of the filing, that any language drafted by AI--even if later edited by a human--was personally reviewed by the filer and that all legal citations reference actual, non-fictitious cases or cited authority and accurately reflect the contents of such authority.

/s/Jason R. Alderman, Esq.
Jason R. Alderman, Esq.

**EXHIBIT A**

# Less Than Nothing

In her novel *Black Beauty*, which I read and reread as a child, Anna Sewell describes horses like this: "We call them dumb animals, and so they are, for they cannot tell us how they feel, but they do not suffer less because they have no words." I've thought a lot about that idea: that you can be in pain even if you can't articulate it. When I was small, I loved that *Black Beauty* was written from the horse's point of view. It took me inside the horse's mind, describing his memories of his mother ("a wise old horse") and what she wished for him: a life built on kindness and freedom. Reading that book, I vowed never to cause suffering when I could help it. Just like the story's main character, I wanted to grow up gentle and good, never learning bad ways.

What many people don't know about horses is that despite their size and power, they are vulnerable prey animals. They depend on flight—their ability to outrun predators—as their primary means of survival. That requires that they use their well-honed intuitions to sense danger in their surroundings. I've described how, from the moment I met my horse, Alice, I felt in sync with her. Little did I know that she and I would soon share even more in common: a reliance on wariness and, eventually, a need to escape.

The first signs of trouble came with a few subtle changes to our family routine. First, Skydy started sleeping in my parents' room, leaving me alone each night in the room the two of us had shared. Then, my mom—who up to that point had usually run my bath, washed my hair, and gotten me in my pj's each night—stepped back for some reason, and Dad began doing that. Now, once I was ready for bed, Mom would say a quick goodnight, but it was Dad who tucked me in, read me a story, and cuddled me. At first, all that felt normal and good. I loved my dad. He'd taught me to ride Alice. When I competed in horse shows, which I was learning how to do, he was always my biggest fan. I saw Dad as capable and even invincible. I trusted him.

Then, during bath time one night, Dad abruptly told me to stand up. "We've got to make sure you're extra clean," he said. The command felt weird to me. I stayed submerged, the soapsuds hiding my nakedness. I wasn't sure why I felt embarrassed, but I did. "Can Mom come in?" I asked.

"No, Mom's busy," Dad said, impatient. He had a washcloth in his hand. I stood up, and he began to soap me all over, spending extra time between my legs.

That night in my room, Dad touched me in ways nobody had before. He told me I was his special girl, his favorite, and that this was his way of giving me "extra love." He used his fingers at first. Then, days later, his mouth. He called my private parts my "tee-tee" and his penis his "pee-pee." It wasn't long before he asked if I wanted to touch his genitals. I didn't want to, but he wanted me to. He was my father, so I did.

I tried to stop these things from happening. "I don't want bedtime stories anymore," I announced one day. "I don't want cuddles anymore. I can do bath time by myself. I'm a big girl now." And so the bedtime rituals ended, but the abuse didn't. At night in the dark, I'd wait. Dad didn't always come in, but every night I feared he would. The door would open a crack, revealing a stripe of light from the hall, and the hinges would creak slightly —I'll always remember that soft squeaking sound. Then Dad would close the door behind him and slip into my twin bed, fondling me, forcing himself on me. For a while, I tried hiding in the tight space under my box spring, but that didn't work. "Get out from under there," he'd say, "or I'll take Alice away." I couldn't imagine that. So out I'd crawl.

At this point, Mom—once so warm and loving—became cold and remote, at least when it came to me. I was already a pleaser; up early, I'd make my bed, trying to help her manage the mayhem of getting three kids ready for school. Now, I tried even harder to make her love me, offering to go grocery shopping with her—anything to not be left alone with Dad. But Mom seemed unreachable. The whippings with the thorny rose branches started around this time. And it seemed to me she was drinking more beer. Once I had been her beautiful, angel-kissed girl. But now she told me a story I'd never heard before: she'd always wondered if I was really her daughter. In the hospital right after my birth, she told me, one of the nurses had briefly given her a different baby girl to breastfeed, but the woman soon rushed back in and took that infant away. Maybe I'd been switched with another child, she said. Maybe I was just a big mistake.

I was confused. Why was Mom mad at me? Did she know what Dad was doing to me? I have a distinct memory of my bedroom door opening slightly one night as Dad molested me—I heard that squeaking sound again. Was that Mom, or did I just desperately want it to be her? I didn't see her face. Could she have seen Dad under the covers with me? The door slowly closed again.

I began to get painful urinary tract infections. Mom took me to the doctor again and again. The nurses were mystified. After one examination, a doctor told my mother that my hymen had been broken. My mother didn't hesitate. "Oh, she rides horses bareback," she explained. That was the end of that. I didn't even know what a hymen was.

My infections were so severe at times that I couldn't hold my urine. Mortified, I started tying a sweater around my waist at school so that when I sat down, the sweater would absorb what leaked out. The other kids recognized the smell and where it was coming from, though, and nicknamed me "Pee Girl." At home, Mom flew into a rage whenever she found my wet underwear, beating my bottom until it stung. So I tried to hide the soiled clothes—and, God forbid, the sheets when I wet the bed. They stank, so she'd always find them. But I figured getting a single beating for a pile of dirty underwear was better than getting beat one pair at a time.

Around this time, Danny was sent away to a Baptist reform school in Washington State. Dad then changed up his tactics, doing what he wanted to me more obviously, not just in the middle of the night. If Mom was out, he'd molest me in the afternoon, promising me that afterward, we'd put on a movie—he loved scary films best—make some popcorn, and stay up late together. By mixing his sick behavior with cozy bonding, he normalized it, at least partly. I still hated what Dad did to me, but I began to bargain with myself: just get the icky part over with so the good parts of life can go on.

Then something happened that made sure life had no more good parts. Forrest was a friend of my father's. He was tall and muscular, with a military bearing, and he had a tattoo on his chest. I knew this because he liked to show off his physique at the pool-and-beer parties our two families began having together. Suddenly, Forrest—who had his own landscaping business—was around our house a lot. My dad encouraged Skydy and me to call him "Uncle Forrest" and told me to befriend his stepdaughter, Sheila, which I was happy to do. She was sixteen—nine years older than me—so I

thought she was the epitome of cool. But she could seem distant sometimes too. I later found out why.

One night Mom, Dad, and I were out on our porch with Forrest, Sheila, and Sheila's mom. I've corresponded with Sheila about this recently, and she remembers this too. We think our little brothers were playing somewhere inside the house when our parents—who were drinking beer, as usual—began joking around about how "naughty" Sheila and I were. Either my dad or Forrest then suggested that they "trade" us for a night. I recall Forrest glancing at my father and saying something about "a backwards sleepover. Jenna can come sleep at our house, and Sheila can sleep here."

I didn't know it then, but by this point, Forrest had been sexually abusing Sheila for two years. Since Sheila and I have reconnected, she's told me she was never "traded" to my dad for him to abuse. I wasn't so fortunate. I'll never know the exact date I was first left with Forrest. I do remember that it was with my father's permission. I recall being in a bathtub—I've always thought it was in Forrest and his wife's home, but Sheila wonders if it may have been in one of the empty vacation homes whose lawns Forrest was paid to tend. Forrest walked into the bathroom. I told him I wanted to bathe myself, but he wouldn't leave. He sat on the toilet next to me and acted as if this were the most natural thing in the world—a grown man scrubbing the naked body of someone else's young daughter. "We've got to wash you good. You're a dirty girl," he said.

That time, Forrest did things to me that my father had done and other things my father had not. When he put his fingers inside me, like my dad did, Forrest narrated his actions out loud. "I think you can take another finger," he said, implying that was a good thing. His chest was shaved, and he wanted me to admire its smoothness. "Touch my muscles," he commanded. "Tell me how big they are." Forrest lay on top of me, crushing me. He tried to kiss me, but I turned my face away. When he put his mouth down there, I remember he held my wrists tightly. He was very strong. I couldn't escape.

—

To this day, I rely on music to make the world make sense. I'll be in the front passenger seat on one of those early morning drives to school, my children buckled in behind me. With Robbie at the wheel, my hands are free to plug

my iPhone into the sound system and push shuffle. Chances are good that as it clicks through my two thousand or so songs, it'll land on one from the period during which I began to process how much my dad and Forrest had hurt me. I have a lot of songs from the 1990s and early 2000s among my favorites, I guess because that's when I leaned on music the hardest. Tracy Chapman will start singing "Give Me One Reason" ("I don't want no one to squeeze me / They might take away my life"). Or Matchbox Twenty will launch into "Bright Lights" ("I got a hole in me now / I got a scar I can talk about"). Or the thunderclap will sound at the beginning of Garth Brooks's "The Thunder Rolls." When that happens, all three kids start screaming. They are born-and-bred Australians, and while they love a lot of American music, they think my taste is terrible. "Oh, Mom," they'll moan, rolling their eyes. "You've *got* to update your tunes!" Nonetheless, we all enjoy this ritual—my ancient hit parade, their merciless teasing—so I just laugh and turn up the volume. Then I lose myself a bit, remembering how, as a young girl, I wielded my Walkman like a talisman, to ward off evil.

As I have become a "public person"—by which I mean a woman whose story of survival has been told and retold by the media—I have kept much about my childhood private. When I began working with a collaborator on this book, I had never said publicly that my father molested me and then gave me to another man to molest. When asked, I had always been vague, saying only that I was abused by a family friend. Well, that was true, as far as it went. But there was so much more awfulness left unsaid.

Forrest was the first man to penetrate me with his penis. Not long afterward, my father did the same. Sometimes what they each did to me was so similar that I suspected they were comparing notes. Other times they liked to spend time with me together. They once insisted on taking me to see the movie *Arachnophobia*, about a species of South American spiders that is smuggled into the United States inside a coffin. I remember they thought it was funny to take me, a small child, to a horror film about eight-legged insects that breed and kill. I've been terrified of spiders ever since.

Sheila, meanwhile, stopped coming to our house altogether. Only while writing this book have I discovered that in 1990 she filed a formal complaint with the Florida Department of Children and Families, alleging that Forrest had sexually abused her. Her mother didn't believe her then, but the state did. In September of that year, she got a restraining order against Forrest and went to live with another relative. From what Sheila and I have

pieced together, it seems that at this point, Forrest turned his attentions to me.

Recently, Sheila told me that we were not the only girls Forrest molested. In 2000, he was convicted of abusing another girl in North Carolina in 1996. He served fourteen months in prison and was a registered sex offender for ten years, from 2001 to 2011. Sheila says more girls came forward over the years to accuse him of abuse, but her mom disbelieved them. Sheila's mom stood by Forrest until 2010, when she found pornography on his computer and threw him out for good.

I feel so grateful that Sheila and I have found each other again, and I wanted to make sure I didn't drag her into the spotlight. Many survivors have made that decision, to remain anonymous, and I respect that choice. But Sheila wanted me to use her real first name here. "I have had to be silent for so long," she wrote in an email. "This is me and I'm not afraid to be me. I didn't do anything wrong to be ashamed of. I don't want to hide from the truth."

I love Sheila's self-confidence, and today I am inspired by it. But as a child, I had no such inspiration. "It's hard to believe that there's nobody out there / It's hard to believe that I'm all alone," the Red Hot Chili Peppers sang from the cheap transistor radio I'd begun keeping next to my bed. Their lyrics seemed meant for me. I turned to Alice for help. I was trying to hang onto the feeling that I was part of a family and that I belonged—if not to my parents, or entirely to myself, then maybe to my horse, to our groves of slash pines, to the island in the middle of our pond. But day by day, that feeling of belonging was fading away.

Some nights Alice and I would stay out long after sunset, missing dinner and whatever came after it. I got in trouble with Mom, but I didn't care. I felt she was willfully ignoring what was in front of her face. Her outgoing tomboy had become withdrawn. Her straight-A student had begun cutting class. Her Peter Pan wasn't so confident anymore. That's what happens when a girl is preyed upon. Mom had to know that *something* was up, but she didn't ask me what, and she didn't intervene. More than once, she even implied I was trying to steal her husband from her. One night I was hiding under the kitchen table to avoid bath time with Dad. Mom got the broom and jabbed me with it until I came out. "Look what you're making me do!" she yelled, as if what was happening were something I'd set in motion. My response: defiance. I didn't want her husband or his nasty friend Forrest! So

what if I missed dinner every night? Throwing food away was nothing compared to throwing a daughter away. And that's what I believed she was doing.

Not surprisingly, I guess, during this period I clung to even the tiniest expressions of affection, even disturbing ones. While sexually abusing me, for example, my father would often ask me questions about what his actions were causing me to feel. He was fascinated by my body's reactions, and sometimes what he did felt good, sort of, though any pleasure I felt was mixed with disgust. I didn't know what an orgasm was, but I knew I didn't want to encourage him. Still, sometimes my body betrayed me, shivering under his touch. That's when my father would say he was proud of me. "This is why we do this," he'd say. "This is why I give you all this extra love." A part of me relished feeling special—especially since my mother had labeled me good-for-nothing. But when Dad would compare me to Mom, saying, "You're my star. I don't even do this with your mother," I felt sick to my stomach.

I guess some instinct for self-preservation made me try to claim my body as my own, because I started to experiment with boys. My best friend, Kyle, lived on the same side of Rackley Road as us with his dad, J.D.—who I'm pretty sure was using Kyle as his punching bag—and his mom, who everyone called Chicken. One day when we were maybe eight or nine years old, Kyle showed me a *Playboy* magazine he'd found in his dad's closet, and we took off our clothes, then shyly started to kiss and gently touch each other. When I think back on this behavior, I'm struck by the pure innocence of it. We were children; my chest at that point was as flat as Kyle's (which is why we were both equally wowed by the breasts we saw in that pilfered *Playboy*). Guided more by curiosity than anything approximating lust, we weren't sure what we were doing, but we knew that it felt good. At first I was the leader, mimicking things Dad and Forrest did to me, and Kyle was bewildered. But my friend was inquisitive, too, and soon, we were playing this game every day. Then, my mother caught us. She went nuts, banishing Kyle from our house and telling me I was a bad, dirty girl.

Kyle and I weren't allowed to see each other for a long time. We were even forbidden from talking across the fence that separated our properties. That's when I got angry. Before this, I'd questioned the ways my life was changing, but I was confused about who to blame. Now, I chose to blame

my mother. "How can she say what I'm doing with Kyle is bad, when Dad and Forrest do things to me that are so much worse?" I asked myself.

In *Charlotte's Web,* a lamb tells Wilbur that pigs mean "less than nothing" to her. Wilbur is outraged and argues there is no such thing. "Nothing is absolutely the limit of nothingness," he protests. "It's the lowest you can go…If there were something that was less than nothing, then nothing would not be nothing, it would be something—even though it's just a very little bit of something." Every night, as I lay in my bed, dreading the now-familiar creak of the door, I tried to remember a time when I'd been more than nothing. I longed to be worth something again.

**EXHIBIT B**



# POLYGRAPH EXAMINATION REPORT

| | |
|---|---|
| **Subject Name:** | Sky William Roberts Sr. |
| **Report Prepared For:** | The Foodman Firm P.A. & The Alderman Law Firm |
| **Date of Examination:** | February 6, 2026 |
| **Date of Report:** | February 8, 2026 |
| **Examiner:** | Jordan Lovelace |
| **Credentials:** | CPE, FCPE |

CONFIDENTIAL DOCUMENT

# Table of Contents

**1. Subject Information**                                            3

**2. Examiner Information**                                           4

**3. Polygraph Instrument Information**                              5

**4. Polygraph Technique Used**                                       6

**5. Basic Case Information**                                         7

**6. Subject's Version of the Incident**                             8

**7. Polygraph Examination**                                          9

**8. Results and Conclusion**                                        10

# 1. Subject Information

| | |
|---|---|
| **Full Name** | Sky William Roberts Sr. |
| **Date of Birth** | July 28, 1956 |
| **Age** | 69 |
| **Gender** | Male |
| **Race/Ethnicity** | Caucasion |
| **Address** | 15020 SE 47th St., Summerfield, FL 34491 |
| **Phone Number** | N/A |
| **Occupation** | Retired |
| **Employer** | NA |
| **Education** | GED |
| **Medical Conditions/Medications** | Cholesterol Medication but did not take the medication before the examination. Did not claim to have any other health issues |

## 2. Examiner Information

| | |
|---|---|
| **Examiner Name** | Jordan Lovelace |
| **Credentials** | CPE, FCPE |
| **License Number** | NA |
| **Years of Experience** | 20 |
| **Certifications & Memberships** | APA Member Federally Certified Polygraph Examiner |

### Background & Qualifications

Examiner is a federally certified polygraph examiner and member of the American Polygraph Association with membership to Florida Polygraph Association pending. Examiner has approximately 20 years of relevant experience, with 8 years in the field as an examiner.

# 3. Polygraph Instrument Information

| | |
|---|---|
| **Manufacturer** | Lafayette Instrument |
| **Model** | LX5000 |
| **Serial Number** | 133378FK |
| **Last Calibration Date** | February 3, 2026 |
| **Components Used** | Two Pneumograph Tubes, Cardio Cuff, GSR Plates, Motion Sensor Pad (Tested functional, but presented as non-functional during examination), |

# 4. Polygraph Technique Used

| Examination Technique | Utah Zone Comparison Technique (ZCT) |
|---|---|

## Technique Description

This was a specific issue polygraph examination related to allegations made against subject by a victim of sexual assault. The allegation were made as part of a published work and have not been corroborated or prosecuted previously.

## Scoring Method

3 position numerical scoring criteria was used for this examination.

# 5. Basic Case Information

| Case/File Number | SKY WILLIAM ROBERTS Sr 02062026 |
|---|---|
| Type of Examination | Civil Matter |
| Requesting Party | Daniel Foodman Esq. |

## Case Background

This matter arises as a referral from The Foodman Firm P.A. & The Alderman Law Firm. The central figure in this case is Sky Roberts, who is the father of Virginia Roberts Giuffre. Ms. Giuffre is a survivor of sexual assault and was one of the key victims in the criminal case brought against the late convicted felon, Jeffrey Epstein. As an adult, Ms. Roberts Giuffre authored and published a memoir entitled Nobody's Girl, which chronicles her experiences of sexual abuse from childhood into adulthood. Within this publication, specifically in approximately Chapter 4, Ms. Giuffre details allegations of sexual abuse by her father, Sky Roberts. Mr. Roberts has publicly denied these allegations. In light of these conflicting accounts, the instant evaluation has been commissioned to assess the credibility of Mr. Roberts' statements and to examine the veracity and integrity of his assertions regarding the matters described.

## Issues to be Addressed

During the course of the psycho-physiological evaluation, the primary issues under examination concerned whether Mr. Sky Roberts engaged in sexual intercourse with his daughter, Ms. Virginia Roberts Giuffre, and whether he ever engaged in any form of inappropriate or sexually suggestive physical contact with her. These inquiries were conducted as part of a broader assessment aimed at evaluating the credibility of Mr. Roberts' public denials of the allegations, as detailed in Ms. Giuffre's published account.

# 6. Subject's Version of the Incident

## Subject's Statement

During the pretest interview, the subject unequivocally denied all allegations of sexual misconduct leveled against him, including but not limited to engaging in sexual intercourse with his daughter, Virginia Roberts Giuffre. He further denied any form of sexual contact with his daughter, explicitly rejecting claims of fondling, inappropriate touching, molestation, or any behavior intended for sexual gratification. The subject described his relationship with his daughter as positive, stable, and emotionally supportive. He expressed bewilderment and deep offense at the allegations, stating that they are inconsistent with the nature of their familial bond. He specifically challenged the portrayal of his family's socioeconomic circumstances as depicted in his daughter's memoir, Nobody's Girl, asserting that the description of "growing up poor" does not accurately reflect the environment in which he raised his children. When confronted with the contents of the book, particularly the allegations of abuse, the subject stated that he found them deeply disturbing and offensive. He conveyed a strong emotional reaction, describing himself as "disgusted" by the notion of sexual abuse and emphasized his complete rejection of such behavior. The subject professed confusion and distress over his daughter's accusations, indicating that he could not comprehend how she could attribute such actions to him.

## Admissions Made

NA

## Specific Denials

NA

# 7. Polygraph Examination

| | |
|---|---|
| **Examination Location** | Hyatt Regency - Orlando International Airport |
| **Start Time** | 10:51 AM |
| **End Time** | 1:08 PM |
| **Number of Charts Collected** | 4 |

## Pre-Test Interview Summary

The pretest interview commenced with a formal introduction to the subject and a comprehensive explanation of the purpose, scope, and objectives of the polygraph examination. The subject was provided with a detailed overview of the examination process, including the procedural steps, methodology, and expected protocols to ensure transparency and informed participation. A standardized consent form was presented to the subject, which outlined the nature of the examination, voluntary participation, confidentiality considerations, and associated risks and limitations. The subject confirmed his understanding of the document and executed his signature voluntarily, thereby providing informed consent to proceed with the evaluation. Following the administrative preliminaries, the examiner conducted a biographical data collection session, during which the subject provided detailed personal and occupational information, including current employment status, residential history, and other relevant identifying markers necessary for record accuracy and contextual analysis. A comprehensive medical screening was administered to assess the subject's physical and mental fitness to undergo the polygraph examination. This review ensured that no medical conditions or medications were present that could compromise the physiological measurements or validity of the test results. The examiner then provided an in-depth educational briefing on the polygraph instrument, including its technical components, operational mechanics, and the underlying psychophysiological principles that inform polygraph testing. The theoretical framework was explained through illustrative examples demonstrating how autonomic responses typically correlate with truthful versus deceptive responses. To familiarize the subject with the testing process and reduce potential anxiety, a practice examination was conducted. This trial run allowed the subject to experience the procedure firsthand and provided the examiner with baseline physiological data for comparative analysis. Finally, the specific examination questions to be used during the formal polygraph session were thoroughly reviewed and discussed with the subject. Each question was clarified to ensure comprehension and consistency of interpretation. The subject was given the opportunity to ask questions and express any concerns. After confirming his understanding and comfort level with the question formulation, the examination proceeded under controlled conditions.

## Test Questions

As a specific issue polygraph examination related to sexual abuse, the following relevant questions were used during the administration of this polygraph examination:

R1: Did you ever have vaginal intercourse with your daughter?
R2: Did you ever insert your fingers into your daughter's vagina?
R3: Did you ever touch your daughter in any sexual manner intentionally?

The same relevant questions were asked (but in a different order) and the subject's responses were the same as in the first chart collected.

## In-Test Observations

Noted: Motion sensor pad was not working during the examination although was functional during the functions check days prior; however, the motion sensor pad has no bearing on the collection of physiological data and charts still had all evaluable criteria available for chart scoring.

## Post-Test Interview Summary

The test was concluded and an acknowledgement of the end test was signed by subject.

# 8. Results and Conclusion

Overall Examination Result

## No Deception Indicated (NDI)

## Numerical Scores

N/A

## Chart Analysis Summary

N/A

## Examiner's Professional Opinion

After a careful analysis of the subject's polygraph test, it is the opinion of this examiner that there were no consistent psycho-physiological responses usually indicative of deception to the relevant questions. It is therefore the opinion of this examiner that no deception was indicated during the examination.

## Additional Comments/Recommendations

None

2/8/2026

**Jordan Lovelace**
CPE, FCPE

**Date**
February 8, 2026